DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from a judgment of the Ottawa County Court of Common Pleas, where, after a bench trial, the trial court found in favor of appellee, Luckey Farmers, Inc. ("Luckey Farmers"). Appellants, Deborah Squires and Louis C. Squires, Jr., appeal that judgment and ask this court to consider the following assignments of error:
 {¶ 2} "1. The trial court erroneously found in favor of defendants/appellee [sic] and awarded plaintiffs/appellants no damages despite the negligence per se actions of defendant/appellee.
 {¶ 3} "2. The trial court's decision awarding judgment against the plaintiffs/appellants and for defendant/appellee is against the manifest weight of the evidence."
 {¶ 4} On May 6, 2000, appellants were working in their garden, which was located on the east side of State Route 105. On that date, Luckey Farmers was spraying an herbicide and liquid nitrogen, a fertilizer, on farm property located on the west side of State Route 105. A west to southwest wind, blowing at 10 to 20 miles per hour, caused the herbicide and fertilizer to drift across the road.
 {¶ 5} At the trial of this matter, Louis Squires testified that he saw "dust" from the sprayed property drifting toward himself and his wife. He asserted that he and Deborah ran into the garage and then into the house and closed their windows. Both Louis and Deborah stated that they "tasted" and/or "smelled" a chemical, but neither party indicated that he or she felt the chemicals touch his or her skin. According to Louis, several of the trees on his property were either severely damaged or died after the spray drifted on his property. In addition he testified that many flowers and other plants died, that Deborah developed serious and permanent rashes, and that the family dog became ill and almost died.
 {¶ 6} Deborah, who, prior to her exposure to the herbicide and fertilizer, suffered from dry skin on her hands and, occasionally, a "sweat rash" on the inside of her elbow and on her neck, and from a rash on her legs, testified that the condition that she developed after the spray drift was different than anything that she had previously experienced. Deborah described this new condition as resembling a sunburn on her face and shoulders that then developed blisters. When the blisters broke, they left scars. The "sunburn" eventually affected the skin on other parts, e.g., her arms and legs, of Deborah's body.
 {¶ 7} Due to the fact that the product used to prevent insect bites and perspiration exacerbate her condition, Deborah can no longer spend much time outdoors with her husband doing such things as fishing, camping, bicycle riding, or going to the beach. In her testimony she revealed that she is required to use two different types of prescribed creams on her body per day and "two pills." Deborah testified that she will have this skin condition "off and on" for the rest of her life.
 {¶ 8} On May 7, 2000, Deborah had an appointment with her gynecologist. She mentioned the "sunburn" and was told to see her family doctor if the condition worsened. When she had a second appointment with her gynecologist on May 17, 2000, Deborah again complained about the "rash" or "sunburn" and was told to see her family physician.
 {¶ 9} Deborah first consulted her family physician, Neiman T. Odeh, D.O., for the skin problems allegedly caused by the spray drift on June 6, 2000. She stated that the delay in consulting with Dr. Odeh was due to the fact that she thought that the rash on her face and shoulders was sunburn. Deborah told the doctor that she had been exposed to a pesticide "about a month ago." Dr. Odeh diagnosed her condition as dermatitis and prescribed a cream for her face and a shampoo for her scalp. Deborah did not seek further medical treatment for this specific condition until November 4, 2002.
 {¶ 10} Shortly after the incident on May 6, 2000, Louis filed a complaint with the Ohio Department of Agriculture. On June 15, 2000, one of the department's investigators inspected appellants' property. In his report, the investigator observed that some of appellants' trees appeared to have suffered minor damage, especially on the west side. He noted, however:
 {¶ 11} "As more than a month had passed since Luckey Farmers treated the * * * field west of the Squires home and the fact that symptoms appeared to have deteriorated due to leaf drop, new growth and environmental conditions, I was unable to confirm physical drift had occurred based on physical symptoms."
 {¶ 12} The investigator therefore took several cuttings from appellant's English walnut trees for analysis by the Ohio Department of Agriculture's laboratories. The results of those tests showed the presence of Atrazine, a component of the herbicide sprayed by Luckey Farmers on May 6, 2000. Based on this information, the Ohio Department of Agriculture issued a "Notice of Warning" to Luckey Farmers for a violation of "Ohio Pesticide Law" and Ohio Adm. Code: 901:5-11-02(G), which provides, in pertinent part: " (G) No person shall apply a pesticide at such time or under such conditions that the wind velocity will cause the pesticide to drift and cause damage." The "Notice of Warning" also states: "From the visual symptoms and laboratory analysis of the affected plants material, it is apparent that the pesticide application you made * * * drifted onto the Squires property."
 {¶ 13} Noel R. Heisler, who is a field investigator for Luckey Farms, visited appellants' property on June 3, 2000. In his report, he noted leaf burn on appellants' trees that were next to the road. He also noted, in his testimony, that there was leaf burn, or speckling on appellants' tomato plants. In his testimony, Luckey Farmers' expert, Jeffrey P. Batanian, who owns a tree service, inspected appellants' property one year after the spray drift. In his opinion, the trees had recovered at that time, and he opined that there was no permanent damage. He visited the Squires' property the following year and repeated that the trees looked as if they were healthy. On cross-examination, Batanian did, however, admit that he did find "minor damage" on some trees and that others showed "signs of stress." He also acknowledged the fact that Louis Squires told him that some of the badly damaged trees had been removed. Batanian provided no testimony as to the condition of the other plants on appellants' property that were allegedly damaged by the spray drift.
 {¶ 14} Appellants initiated the instant action on December 27, 2001. They raised, among others, claims of negligence, negligence per se, and loss of consortium. Both their original and amended complaints named the owners of the farmland sprayed by Luckey Farmers as defendants. The trial court, however, granted summary judgment to these defendants before the trial on the merits of this cause.
 {¶ 15} At the close of the trial to the bench on appellants' claims against Luckey Farmers, the lower court ordered the parties to file, in lieu of final arguments, findings of act and conclusions of law. Appellants, nevertheless, filed a written "Closing Argument." Luckey Farmers submitted its proposed findings of fact and conclusions of law. Prior to the lower court's decision on the merits, appellants then filed their own proposed findings of fact and conclusions of law.
 {¶ 16} On October 29, 2003, the trial court adopted, in toto, Luckey Farmers' proposed findings of fact and conclusions of law and dismissed appellants' complaint. In reaching its decision, the trial court adopted the following disputed conclusions of law:
 {¶ 17} "2. The existence and causation of Plaintiff's personal injury and property damage are not matters within the understanding of lay persons and require expert testimony to establish their existence, and to establish that they were proximately caused by Defendant's negligence. Darnell v.Eastman (1970), 23 Ohio St.2d 13. While it is true that a property owner may testify as to the value of his property, trees, and crops, he is still required to present expert testimony as to any losses caused by means that are not within the understanding of lay persons."
 {¶ 18} "3. Plaintiffs have failed to establish, by expert testimony, any connection between the claimed property damage and the spray drift. Indeed, Plaintiffs have failed to establish any permanent damage to their property and they have not introduced any evidence of repair costs associated with the spray drift. The measure of damages to real estate or crops is the cost of repair of any temporary damage and the reduction in the value of the real estate for any permanent damage. Had Plaintiffs proven that any of their trees were destroyed by the spray drift, they would be entitled to compensation for the value of the tree lost."
 {¶ 19} "4. Plaintiffs have also failed to establish, by expert testimony, any causal connection between the spray drift and the rash claimed by Deborah Squires. She waited for over a month before seeing a physician for her rash. She admitted that she could not recall any of the sprayed materials coming in contact with her skin. She further admitted that she had contact dermatitis before this incident. Moreover, Dr. Odeh confirmed that she had this skin condition before the spray incident."
 {¶ 20} "5. Dr. Odeh is not a credible witness as to the causation of Deborah Squires' rash. * * * Dr. Odeh initially testified that a causal relationship between the spray incident and the rash was only a possibility, based upon the history he was given, not any medical evidence. Only upon some strong prompting from counsel did he change his testimony to state that there was probably a causal relationship.
 {¶ 21} In their first assignment of error, appellants assert that the trial court erred in failing to find that Luckey Farmers' actions on May 6, 2000 constituted negligence per se. This assertion is predicated on the fact that Luckey Farmers received a warning for violating Ohio Pesticide[1] Law and Ohio Adm. Code: 901:5-11-02(G). Appellants claim that "absolute liability" is imposed for a violation of a safety statute and regulation; therefore, the trial court erred in failing to award them damages. In its brief, Luckey Farmers does not address appellants' allegation that a safety statute was violated. Instead, Luckey Farmers focuses solely on the violation of on Ohio Adm. Code: 901:5-11-02(G), and maintains that the violation of an administrative rule or regulation is not negligence per se.
 {¶ 22} In their reply brief, appellants cite to, for the first time on appeal, a specific statute to support the proposition that the spraying of the herbicide and fertilizer on a day when the wind speed was between 10 and 20 miles per hour is negligence per se. The relevant provisions of Ohio Pesticide Law, R.C. 921.25, read:
 {¶ 23} "It is unlawful for any person to do any of the following:
 {¶ 24} "(A) Apply, use, directly supervise such application [of a pesticide] or use inconsistent with its labeling, treatment standards, or other restrictions imposed by the director of agriculture;
 {¶ 25} "* * *
 {¶ 26} "(G) Operate in a negligent manner, which includes the operation of faulty or unsafe equipment."
 {¶ 27} Generally, in a negligence action, a plaintiff must establish that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach was the proximate cause of the plaintiff's damages. Jeffers v. Olexo (1989),43 Ohio St.3d 140, 142. In certain circumstances, however, the violation of a duty imposed by statute may lead to a finding of strict liability. Sikora v. Wenzel (2000), 88 Ohio St.3d 493, 495-496. More frequently, courts consider the violation of a statute either evidence of negligence or negligence per se. Id. at 496.
 {¶ 28} If a statute imposes a duty for the safety of others, the failure to perform the duty is negligence per se. Chambersv. St. Mary's School (1998), 82 Ohio St.3d 563, 565. Nonetheless, a finding of negligence per se does not lead to a finding of strict liability. Id. Rather, it means that the plaintiff has demonstrated that the defendant breached the duty owed to the plaintiff. Id. The plaintiff is still required to prove proximate cause and damages. Id., citing Pond v. Leslein
(1995), 72 Ohio St.3d 50, 53. Finally, the violation of an administrative rule does not constitute negligence per se. Id. at the syllabus.
 {¶ 29} There is nothing in the record of this case to show that Luckey Farmers failed to comply with the label directions for the specific herbicide sprayed on the farmland west of appellants' property on May 6, 2000. The last portion of R.C.921.25(A) does, nonetheless, bar application or use of pesticides that are inconsistent with the restrictions imposed by the Director of the Ohio Department of Agriculture. These restrictions include a directive to refrain from spraying an herbicide at a time when the wind velocity would cause drifting. Additionally, R.C. 921.25(G) prohibits the application or use of pesticides in a negligent manner. Consequently, we conclude that Luckey Farmers did violate Ohio Pesticide Law. Therefore, the trial court erred in failing to find that Luckey Farmers was negligent per se, and appellant's first assignment of error as it relates to this issue only is found well-taken. This does not, however, mean that the trial court was required to impose strict liability on Luckey Farmers. The question of whether appellants proved proximate cause and damages must be addressed. This question necessarily involves appellants' second assignment of error.
 {¶ 30} In appellants' second assignment of error, they argue that the trial court's judgment is against the manifest weight of the evidence. Relying on a decision of the Ninth District Court of Appeals, see Fredrick v. Born (Aug. 21, 1996), 9th Dist. No. 95CA006286, appellants ask this court to follow State v.Thompkins (1997), 78 Ohio St.3d 385, a case in which the Ohio Supreme Court set forth the manifest weight of the evidence standard to be applied in criminal cases. The rationale offered by the Fredrick court in deciding that it would adopt the criminal manifest weight standard in a civil case was simply because there was "no reason not to apply the same standard to a manifest weight challenge to a civil judgment." Id. We disagree with this rationale.
 {¶ 31} The Ohio Supreme Court set forth the appellate standard to be applied when a civil judgment is challenged on the basis of manifest weight of the evidence in C.E. Morris v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279. Under this standard, we must examine the record to see whether the trial court's judgment is supported by "some competent, credible evidence going to all the essential elements of the case." Further, in civil cases involving the issue of manifest weight, an appellate court cannot weigh the evidence and pass upon its sufficiency. Seasons CoalCo., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 79-80. This manifest weight standard has always been different from that employed in a criminal case. See, e.g., State v. Eley (1978),56 Ohio St.2d 169, syllabus (In a criminal case, a reviewing court cannot overturn the decision of the trier of fact where the evidence, if believed, would be sufficient to convince the average mind of the defendant's guilt beyond a reasonable doubt.). Moreover, in Thompkins, the Ohio Supreme Court did not extend the standard for determining whether a criminal conviction is against the manifest weight evidence to civil cases. Thus, we are bound by the rule set forth in C.E. Morris. Accord,Lichtenberg Constr. Development, Inc. v. Paul W. Wilson, Inc.
(Sept. 28, 2001), 1st Dist. No. C-000811.
 {¶ 32} Appellants assert that because the trial court adopted Luckey Farmers' findings of fact and conclusions of law, its judgment is against the manifest weight of the evidence. Appellants claim that some competent, credible evidence was offered to establish a causal connection between (1) the claimed property damage and the spray drift; and (2) Deborah's skin condition and the herbicide spray drift. Appellants also contend that they offered competent, credible evidence on the issue of damages.
 {¶ 33} A trial court may adopt a party's proposed findings of fact and conclusions of law as its own so long as the trial court judge has thoroughly reviewed the document and ensured that it is accurate. Clark v. Smith (1998), 130 Ohio App.3d 648, 649. Thus, the trial court's adoption of Luckey Farmers' findings of fact and conclusions of law is not error unless appellants can demonstrate that the findings of fact are not supported by competent, credible evidence, or that the conclusions of law are not supported by legally sufficient evidence. Bokar v. Lax
(Sept. 3, 1997), 9th Dist. Nos. 2630-M, 2665-M, citing Maloneyv. Patterson (1989), 63 Ohio App.3d 405, 409. See, also, NewHaven Corner Carryout, Inc. v. Clay Distributing Co., 3rd Dist. No. 13-01-30, 2002-Ohio-2726, at ¶ 27. (Citations omitted.)
 {¶ 34} We shall first address the question of proximate cause and damages with regard to appellants' property.
 {¶ 35} Where a breach of duty has occurred, liability will not attach unless there is a causal connection between the conduct of the tortfeasor and the plaintiff's injuries. Sutowskiv. Eli Lilly Co. (1998), 82 Ohio St.3d 347, 351. The test employed to establish proximate cause: "is the sine qua non or `but for' test. Thus, a defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred but for that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct. Prosser Keeton, Law of Torts (5 Ed. 1984), 266." Anderson v. St. Francis-St. GeorgeHospital (1996) 77 Ohio St.3d 82, 84-85.
 {¶ 36} In applying this test to determine whether there is a causal connection between the spray drift and the damage to appellants' property, we must conclude that some competent, credible evidence was offered to establish that "but for" the herbicide/fertilizer spray drift, appellants' property would not have sustained damage. Conversely, then, competent, credible evidence does not support Luckey Farmers' proposed findings of fact and conclusions of law.
 {¶ 37} In the instant case, Louis Squires testified that all the plants and trees on his property were healthy and in good condition prior to May 6, 2000, and that they died, were dying, or sustained severe damage after spray drift.
 {¶ 38} Matthew L. Beal, who was the Pesticide Control Supervisor at the Ohio Department of Agriculture on May 6, 2000, testified that he received a complaint from appellants on June 13, 2000. In response to this complaint, Beal sent the previously mentioned field representative to inspect the damage, if any, caused by the spray drift. The field representative observed that the field sprayed by Luckey Farmers was the only field in close proximity to appellants' property. He indicated that appellants' English Walnut trees were exhibiting symptoms of injury, for example, leaf curling and black edges, especially on the west side. The field inspector took some plant cuttings for analysis. It was the result of this analysis that revealed the presence of Atrazine in the specimens. Based on this test result, Beal opined that it was the spray drift that caused the damage to appellants' property. That the Ohio Department of Agriculture issued a "Notice of Warning" to Luckey Farmers supports this opinion.
 {¶ 39} On the other hand, Luckey Farmers failed to offer any evidence to show the lack of a causal connection between the spray drift and the damage to appellants' plants and trees. The gravamen of their defense was simply an insufficient showing of damages. We must therefore find that the trial court's judgment on the issue of the proximate cause of the injury to appellants' property is not supported by competent, credible evidence; i.e., is against the manifest weight of the evidence. Thus, the trial court erred in adopting Luckey Farmers' proposed findings of fact and conclusions of law on this issue.
 {¶ 40} On the question of damages to appellants' property, the conclusions of law related to property damage specify that appellants were required to (1) present expert testimony as to any losses not within the understanding of a lay person; and (2) to introduce evidence of permanent damage and/or repair costs of temporary damage "and the reduction in value of the real estate for any permanent damage."
 {¶ 41} For the following reasons, we find that the trial court's conclusions as to the manner in which appellants were required to prove damages to their trees and plants is in error. The general rule for measuring damages to real estate is found inOhio Collieries Co. v. Cocke (1923), 107 Ohio St. 238, paragraph five of the syllabus. Under this rule, if the injury is of a permanent or irreparable nature, the owner of the property is entitled to recover, "the difference in the market value of the property as a whole, including improvements thereon, before and after the injury." Id. If the damage is reparable, that is, the property can be restored, "the measure of damages is the reasonable cost of restoration, plus the reasonable value of the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property as a whole before and after the injury, in which case the difference in the market value before and after the injury becomes the measure." Id.
 {¶ 42} In Denoyer v. Lamb (1984), 22 Ohio App.3d 136, 138, the First Appellate District expanded on this theory. TheDenoyer court held that, if the owner of the land intends to use his property for his personal use and the trees and growth are damaged or destroyed, the owner is not limited to the diminution in the value of his real estate or to stumpage. Instead, in a case involving damage to trees or other growth, "[h]e may recover as damages the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible, without requiring grossly disproportionate expenditures and with allowance for the natural processes of regeneration within a reasonable time." Id.
 {¶ 43} This precept was reiterated in Lakewood Homes, Inc.v. B.P. Oil, Inc. (Aug. 26, 1999), 3rd Dist. No. 5-98-29, 1999-Ohio-851 (measure of damages is restoration value when the trees are used for a specific purpose including shade or ornamental purposes); Corporate Properties Investment, Inc. v.Nozik (Oct. 25, 1991), 11th Dist. No. 90-L-15-087 (replacement value of trees used to measure damages when the property on which the trees were cut was used for recreational purpose) and followed by this court in Vanderbeck v. CSX Railroad (Feb. 7, 1992), 6th Dist. No. H-90-45 (Damages for the cutting, destroying, or damaging of trees may include compensation for either the reduction in the value of the land or, at the owner's option, reasonable restoration costs.).
 {¶ 44} In the present case, appellants used the produce from their fruit trees and garden and the nuts from the English Walnut trees for themselves and for gifts. Some of the other trees were planted to commemorate the deaths of family members. The remaining trees and plants were ornamental. Thus, the trial court erred in adopting a measure of damages that required evidence of the reduction in the value of the real estate for any permanent damage.
 {¶ 45} At trial, the common pleas court allowed Louis Squires to provide opinions[2] as to the value of destroyed trees and plants and opinions regarding the loss in value of damaged trees. Luckey Farmers did not raise a cross-assignment of error as to these rulings. Further, in its Conclusions of Law Nos. 2 and 3, the court below apparently concedes that the owner of trees and plants is permitted to testify as to the restoration value of these items that died or were destroyed. Thus, we find that the trial court's denial of any compensation for the loss of appellants' property is not supported by some competent, credible evidence, and, as a result, the trial court erred in adopting Luckey Farmers' conclusions of law as they relate to the issue of damages to appellants' property.
 {¶ 46} To repeat, Louis Squires testified that appellants' trees and plants were healthy prior to the contact with the spray drift on May 6, 2000. He stated that after the spray drift, each tree on his property had a "good side" and a "bad side", and that he lost his English Walnut crop in 2000. He explained that the damaged or bad side of each tree was on the side facing west. In other words, the spray drift came from the west and the trees suffered damage on that side. Photographs showing the trees both before and after the incident were entered into evidence. The "after" photographs depict either dead or damaged trees.
 {¶ 47} Using a diagram, Louis discussed each tree and plant on his property that was damaged or destroyed as a result of the drift spray. He then assigned a value to each of these trees. He first testified that four fruit trees died after the spray drift and had to be removed. Louis valued these trees at $150 each. The fifth tree was an English walnut, which Louis indicated was damaged on the west side. He claimed that the replacement value of this tree is $5,000. Louis next testified that all of the plants in his garden died within three to five days after the spray drift. According to Louis, appellants paid $100 for the garden plants. He maintained that the value of a crab apple tree that he believed was so damaged that it would die was $100. He continued describing the damage to each tree, plant or shrub on appellants' property and assigning a value to each of these items.
 {¶ 48} Using the values ascribed by Louis, appellants' property damages would total over $25,000. It appears, however, that most of these values are for the replacement of the particular tree, that is, for a tree that is already dead or dying, and not for loss of value if damaged, e.g., the English Walnut tree that is damaged only on the west side. Thus, this court will not, on appeal, determine the amount of damages to be awarded to appellants for the property loss and damage, but shall remand this case to the trial court to determine that amount.
 {¶ 49} We now turn to the question of whether the trial court erred in adopting Luckey Farmers' conclusions of law as they relate to the proximate cause of Deborah's alleged injury, to wit, her rashes. In adopting Luckey Farmers Conclusion of Law No. 4, the trial court found that appellants failed to establish a causal connection between the spray drift and the rash experienced by Deborah Squires. In Conclusion of Law No. 5, the judge held that Deborah's family physician was not a credible witness on the issue of the causation of her rash. For the following reasons, we find that Conclusions of Law Nos. 4 and 5 are supported by the legally sufficient evidence adduced in this cause because Dr. Odeh's deposition testimony was insufficient to establish that the spray drift was the proximate cause of Deborah's rashes.
 {¶ 50} "Expert testimony is needed on complex issues outside the area of common knowledge, such as an injury's cause and effect." Laderer v. St. Rita's Med. (1997),122 Ohio App.3d 587,598, citing Darnell v. Eastman (1970), 23 Ohio St.2d 13, syllabus. The establishment of the proximate cause of an injury "through medical expert testimony must be by probability. * * * Opinions stated with a lesser degree of certainty must be excluded as speculative." Shumaker v. Oliver B. Cannon Sons,Inc. (1986), 28 Ohio St.3d 367, 369. Probability means more than a 50 percent likelihood. Stinson v. England (1994),69 Ohio St.3d 451, paragraph one of the syllabus. Proof of the possibility of a causal connection is insufficient. Shumaker v.Oliver B. Cannon Sons, Inc., 28 Ohio St.3d at 369, fn. 3. Stating that a medical condition could be causally linked to a specific hazard is insufficient to establish a causal connection to a reasonable degree of probability. Id. at 369-370.
 {¶ 51} On direct examination, Dr. Odeh first testified that it was possible that the pesticide that Deborah was exposed to "could have exacerbated her skin and developed the symptoms that she presented with." Upon Luckey Farmers' objection, appellants' trial counsel informed the physician that he was required to state his opinion in the terms of a reasonable medical probability. Counsel then asked:
 {¶ 52} "Can you state, Doctor, to a reasonable medical certainty whether the exposure to pesticides which was related to you on her [Deborah's] visit a — a month after the occurrence which she related to you was the competent producing cause of the injuries she complained — the rash that she had which you observed on that visit [Of June 6, 2000] regarding the injuries she sustained on May 6, 2001."
 {¶ 53} Dr. Odeh replied, "Yes."
 {¶ 54} Later, however, appellants' trial counsel attempted to relate the continuing rashes that Deborah had subsequent to the year 2000 (through 2003) to the spray drift. Dr. Odeh kept replying that it was "possible." Counsel then explained to the doctor that "possible" doesn't count and that a reasonable medical probability means a "50 percent probability."
 {¶ 55} On cross-examination, Dr. Odeh again stated that there was a possibility that Deborah's skin condition was caused by her exposure to the chemicals in the spray drift. He then stated that it was a 50 percent possibility "because that's the option you gave me." In a continued discourse with Luckey Farmers' trial counsel, the doctor later explained: "* * * 50/50 was the probability or which ever way you put it. To me that's still a possibility because I'm — it's not a hundred percent." Dr. Odeh also testified that the chemicals in the spray drift "could" have caused Deborah's continuing rashes.
 {¶ 56} This reading of Dr. Odeh's deposition transcript clearly reveals that he did not grasp the legal concept of "reasonable medical probability" and that, therefore, the doctor's testimony did not constitute legally sufficient evidence of a causal connection between the May 6, 2000 spray drift and Deborah's skin conditions. Accordingly, the trial court did not err in adopting Luckey Farmers' Conclusions of Law Nos. 4 and 5. Based on the foregoing, appellants' second assignment of error is found well-taken, in part, and not well-taken, in part.
 {¶ 57} The judgment of the Ottawa County Court of Common Pleas as it relates to the alleged injury suffered by Deborah Squires is affirmed. The lower court's judgment as it relates to the damage to appellants' property is reversed, and this cause is remanded to that court for further proceedings consistent with this court's decision. Appellants and Luckey Farmers are ordered to pay the costs of this appeal in equal shares. See App.R. 24.
Judgment affirmed, in part, and reversed, in part.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Pietrykowski, J., Lanzinger, J., concur.
[1] "Pesticide" means, inter alia, "any substance or mixture of substances intended for * * * [u]se as a plant regulator, defoliant, or desiccant." R.C. 921.01(KK)(2). Therefore, under the statute, an herbicide is classified as a "pesticide."
[2] While it is true that, in general, a person must be qualified as an expert in order to testify as to the value of property, an exception exists for owners of real and personal property. Tokles Son v. Midwestern Indemn. Co. (1992),65 Ohio St.3d 621, 625-626; Smith v. Padgett (1987),32 Ohio St.3d 344, 347. The owner's testimony and opinion as to the value of the property is allowed not solely because he has title to that property, but because "he, aided by experience, has some particular means of forming an intelligent and correct judgment as to the value of the property in question beyond that which is possessed by people generally." Tokles Son v. MidwesternIndemn. Co., 65 Ohio St.3d at 627. Thus, the witness-owner must usually show that he is familiar with the property and has current sufficient knowledge of the value of the property. Id. Whether the owner witness is permitted to provide an opinion as to value without qualifying as an expert is a question to be decided by the court. Id. at 628. Here, the lower court implicitly qualified Louis as an expert.